**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

FirePond Liquidating Trust,                                    Civil No. 06-3050 (DWF/AJB)

    Plaintiff,

v.                                                                                      **MEMORANDUM**
                                                                                        **OPINION AND ORDER**
Vigilant Insurance Company
and Federal Insurance Company,

    Defendants.

---

Steven P. Zabel, Esq., and Todd A. Noteboom, Esq., Leonard Street and Deinard, PA, counsel for Plaintiff.

David P. Jendrzejek, Esq., and Terese A. West, Esq., Moss & Barnett, PA, counsel for Defendants.

---

**INTRODUCTION**

The above-entitled matter came before the undersigned United States District Judge on August 16, 2007, pursuant to a Motion for Summary Judgment brought by Plaintiff FirePond Liquidating Trust ("FirePond") and a Cross-Motion for Summary Judgment brought by Defendants Vigilant Insurance Company and Federal Insurance Company (collectively "Chubb").[1] This case arose out of FirePond's allegations that Chubb wrongfully refused to reimburse FirePond, Inc. for losses incurred in defending and settling a lawsuit brought by General Motors Corporation ("GM") against FirePond,

---

[1]    Vigilant Insurance Company and Federal Insurance Company are part of the Chubb Group of Insurance Companies.

Inc. in October 2001 (the "GM Lawsuit").  For the reasons stated below, FirePond's motion is denied and Chubb's cross-motion is granted.

## BACKGROUND

FirePond, Inc.[2] was a company that provided sales and marketing solutions through business-to-business and business-to-consumer e-commerce systems.  In August 1994, FirePond and GM entered into a Products Use and General Services Agreement, thereafter amended in 1998 ("1994 Agreement"), whereby FirePond agreed to create and maintain an exclusive computerized information system to support certain GM e-commerce activities through December 2000.  These activities allowed for GM dealers to configure and price GM vehicles for inventory and sales orders, to make vehicle pricing and options available to consumers through GM's web site, and to maintain data concerning its vehicles.

Under the 1994 Agreement, GM's payments for FirePond's services were due by the 25th day of the month following FirePond's invoice date.  In addition, payments under GM's purchase orders were due on the second day of the second month after an invoice date.  The 1994 Agreement provided for termination based on a breach of payment terms as follows:

> The party complaining of the breach may terminate this Agreement by serving written notice on the other party of its intent to terminate the 1994 Agreement and stating the breach of the 1994 Agreement complained of,

---

[2]   FirePond, Inc. has assigned its assets to FirePond Liquidating Trust.  For the purposes of the present motions, Chubb does not dispute the Trust's standing.  For simplicity, the Court hereinafter refers to both FirePond, Inc. and FirePond Liquidating Trust as "FirePond."

> whereupon the other party shall have a period of thirty (30) days to correct
> the material breach except in the case of . . . breach of the payment
> terms . . . , such period shall be ten (10) days[.]

(Declaration of David P. Jendrzejek ("Jendrzejek Decl."), Ex. 72 at ¶ 21 & Ex. B thereto at § 5.)

In late 1999 or early 2000, GM notified FirePond that GM did not intend to renew the 1994 Agreement upon its expiration in December 2000.[3] GM alleges that FirePond thereafter implemented a "scheme to extort millions of dollars" from GM by creating an artificial payment default under the 1994 Agreement whereby it threatened to cease performance. (Jendrzejek Decl., Ex. 72 at ¶¶ 1, 64.) Specifically, in October 1999, GM requested an accounting for FirePond's work in 1999. In December 1999, FirePond responded by stating that GM owed $201,494.00 for unbilled work for December. Thereafter, FirePond billed GM $565,151.00 for December. GM paid FirePond $201,494.00.[4]

In February 2000, FirePond billed GM $559,540.72 for work performed in January 2000. And on March 7, 2000, FirePond notified GM that its December 1999 and

---

[3] GM asserts that it critically relied on FirePond's continued performance under the 1994 Agreement until its expiration. GM also alleges that FirePond knew that if it ceased performance under the 1994 Agreement prior to its expiration, GM would suffer "extensive damage." (Jendrzejek Decl., Ex. 72 at ¶¶ 67, 71, 76.)

[4] FirePond asserts that it was under the belief that GM would pay FirePond the remaining balance as soon as GM could obtain a release number under its 2000 budget.

3

January 2000 invoices were past due and requested payment by March 18, 2000.[5] GM did not pay the entire amount requested by March 18, 2000. On March 21, 2000, FirePond terminated the 1994 Agreement. FirePond asserted that GM materially breached the 1994 Agreement by failing to cure within ten days of the March 7, 2000 letter.[6] GM alleges that FirePond then threatened to terminate all services unless the parties renegotiated their agreement and GM paid all outstanding invoices. But in its March 21, 2000 letter, FirePond offered to continue to provide services to GM for two weeks "[a]s a gesture of good faith in recognition of the long-standing relationship and in hopes of facilitating a business agreement between GM and FirePond." (Jendrzejek Decl., Ex. 72 at ¶ 43 & Ex. F thereto.)

In a letter dated April 7, 2000, FirePond proposed two options to reestablish FirePond's services. The first option would cost $28 million and involved license fees, the sale of certain FirePond assets, and maintenance fees. The second option would cost $20.5 million and involved license fees and reestablishing licenses previously provided under the 1994 Agreement. GM alleges that FirePond also demanded that GM pay a $1 million license fee to continue FirePond's services for two weeks while a new agreement was being negotiated. This payment would be in addition to a payment for all services provided through February 2000.

---

[5] The March 7, 2000 letter referenced the termination section (*i.e.*, Section 14) of the parties' service agreement.

[6] GM asserts that it had thirty days to cure according to a "more favorable terms" clause in the 1994 Agreement.

On April 11, 2000, GM paid FirePond $1,565,337.37 for the amounts due through February 2000. GM then executed an agreement to re-license certain of FirePond's products for a two-week period and paid FirePond a $1 million license fee. When GM made this payment, it notified FirePond as follows:

> This payment is made under duress without prejudice and shall neither constitute a waiver on the part [of] GM, nor FirePond, of any of our respective rights under the [1994] Agreement or otherwise.

(Jendrzejek Decl., Ex. 72 at ¶ 51 & Ex. H thereto.)[7]

During the remainder of April 2000, FirePond continued to negotiate a longer-term agreement. Then in early May 2000, FirePond informed GM that unless GM agreed to FirePond's proposal, the work stoppage would continue and Firepond would "turn[] the lights out effective tomorrow." (Jendrzejek Decl., Ex. 72 at ¶ 57.) On May 4, 2000, GM executed several agreements whereby it agreed to pay FirePond an additional $5,462,500.00 in license fees, service fees, and a $600,000.00 non-refundable monthly retainer. GM also signed a release to release any claims against FirePond. GM's cover letter accompanying the signed agreements stated in part:

> Despite our efforts to persuade FirePond to abide by the [1994 Agreement], FirePond has refused and insisted that GM sign new services and license agreements and release FirePond from any claims. On Tuesday, May 2, 2000, you announced that FirePond discontinued service, thus carrying through with the threats it has made. Since FirePond's services required by the [1994 Agreement] are essential for GM to maintain its e-commerce initiatives and since we have no other way to

---

[7] On April 12, 2000, FirePond shut down the GM help desk for eighteen minutes. Because an interim agreement was reached between FirePond and GM, FirePond re-opened the help desk. No calls had come in during the time the help desk was shut down.

5

> obtain these services during the balance of the [1994 Agreement] period, you leave us no alternative but to sign the documents [that] you require. In signing them, however, we continue to emphasize again that GM is only signing as a result of the coercive and improper acts of FirePond, is not signing voluntarily and does not agree that these documents signed under these circumstances are valid and enforceable.

(Jendrzejek Decl., Ex. 72 at ¶ 60 & Ex. K thereto.)

Approximately six months later, FirePond procured an Electronic and Information Technology Errors and Omissions Policy ("EIT Policy") from Defendant Vigilant Insurance Company and an excess EIT policy—a Commercial Umbrella Policy ("CU Policy")—from Federal Insurance Company. The terms and conditions of the EIT Policy were made part of the CU Policy.

Then, approximately one year later, in October 2001, GM sued FirePond in Massachusetts Superior Court. GM asserted breach of contract (Count I) and anticipatory repudiation (Count II) based on FirePond's termination of the 1994 Agreement. GM also alleged unjust enrichment and sought disgorgement of amounts paid to FirePond in excess of the amounts entitled under the 1994 Agreement (Count III), the establishment of a constructive trust over such amounts (Count IV), and rescission and restitution under the agreements signed in April and May 2000 (Counts V and VI). In addition, GM alleged breach of the duty of good faith and fair dealing (Count VII), fraud (Count VIII), and violation of Massachusetts law prohibiting unfair or deceptive trade practices (Count IX).

On October 26, 2001, FirePond tendered defense of the GM Lawsuit to Vigilant Insurance Company and demanded that Chubb indemnify FirePond for any losses

6

incurred as a result. On November 9, 2001, Chubb responded asserting that it could neither defend nor indemnify FirePond under the EIT or CU Policies because the allegations in GM's complaint did not meet the definition of a "wrongful act" as defined by the EIT Policy and because several policy exclusions applied. Chubb also denied coverage under the CU Policy based on its belief that there was no coverage under the EIT Policy and therefore no coverage under Coverage A of the CU Policy and because GM's allegations did not meet certain definitions in Coverage B of the CU Policy.

In April 2004, GM and FirePond settled the GM Lawsuit. In August 2004, FirePond filed suit against Chubb for breach of contract, alleging that Chubb wrongfully refused to reimburse FirePond for losses incurred in defending and settling the GM Lawsuit. In September 2004, FirePond sued GM in Minnesota state court to avoid the April 2004 settlement. In October 2004, FirePond dismissed without prejudice its claims against Chubb. In December 2004, GM and FirePond entered into a new settlement agreement that replaced the April 2004 settlement. Thereafter, FirePond commenced this action against Chubb.

## DISCUSSION

### I.     Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences, which may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has

stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record, which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.  Duty to Defend

Chubb contends that it did not have a duty to defend FirePond upon the commencement of the GM Lawsuit. FirePond contends that it did. The interpretation of an insurance policy, including whether an insurer has a legal duty to defend or indemnify its insured, is a question of law. *Auto-Owners Ins. Co. v. Todd*, 547 N.W.2d 696, 698 (Minn. 1996); *Sherman v. Employers' Liab. Ins. Corp.*, 178 N.E.2d 864, 866 (Mass. 1961). "Coverage depends on the allegations in the complaint, which must be compared with the relevant language in the policy." *Agric. Ins. Co. v. Focus Homes, Inc.*, 212 F.3d 407, 410 (8th Cir. 2000); *see also Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.*, 788 N.E.2d 522, 530 (Mass. 2003) (stating that the duty to defend is triggered "if the

8

allegations of the complaint are reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms") (quotations omitted). "The policy must be read as a whole, and unambiguous language must be accorded its plain and ordinary meaning." *SCSC Corp. v. Allied Mut. Inc. Co.*, 536 N.W.2d 305, 311 (Minn. 1995); *see also Mass. Insurers Insolvency Fund v. Safety Ins. Co.*, 787 N.E.2d 555, 558-59 (Mass. 2003) (noting that policy language is "read as a whole and in the context of the insurance scheme in Massachusetts"); *Citation Ins. Co. v. Gomez*, 688 N.E. 2d 951, 952 (Mass. 1998) ("If there is no ambiguity, we construe the words of the policy in their usual and ordinary sense.") (quotations omitted). An insurance contract "must be interpreted in a way that gives all of its provisions meaning." *Current Tech. Concepts, Inc. v. Irie Enters., Inc.*, 530 N.W.2d 539, 543 (Minn. 1995); *see also Sherman v. Employers' Liab. Assurance Corp.*, 178 N.E.2d 864, 866-87 (Mass. 1961) ("An interpretation which gives a reasonable meaning to all of the provisions of a[n insurance] contract is to be preferred to one which leaves a part useless or inexplicable.").

Vigilant Insurance Company provided the following coverage to FirePond under the EIT Policy:

> Subject to the applicable Limits of Insurance, and in excess of the Deductible, we will pay damages the **insured** becomes legally obligated to pay for any **claim** arising out of a **wrongful act**, to which this insurance applies, by or on behalf of the **insured**:
>
> - in the performance or failure to perform **electronic and information technology services**; or
>
> - in the failure of **electronic and information technology products** to perform the function or serve the purpose intended.

9

(Jendrzejek Decl., Ex. 15 at C000317 (emphasis in original)[8].)  The policy defines "wrongful act" to mean "a negligent act, error or omission." (*Id*. at C000331.) The policy defines "electronic and information technology services" to mean:

- computer and data network analysis, consulting or design;
- computer facilities management;
- computer maintenance;
- computer programming;
- computer and electronic equipment repair;
- electronic data processing;
- information management consulting;
- software development;
- systems integration; or
- any other computer related service,

for others.

(*Id*. at C000328-29.)

Chubb contends that the Court should grant summary judgment in its favor asserting, among other things, that the plain and unambiguous terms of the EIT Policy limit coverage to claims arising out of a wrongful act in the performance or failure to perform electronic and information technology services, not for claims arising out of a

---

[8] The EIT Policy explains that "[w]ords and phrases that appear in **bold** print have special meanings and are defined in the Definitions section of this contract." (*Id*. at C000316 (emphasis in original).)

billing dispute. FirePond disagrees. FirePond argues that because the words "professional liability" do not appear in the policies, this Court should not interpret the policies as if their coverage is limited to such liability. In addition, FirePond asserts that the "arising out of" requirement should be interpreted broadly and is satisfied if a claim asserted in GM's complaint has a "causal connection" to the activity covered in the Policy. Here, FirePond asserts that the GM Lawsuit did arise out of a dispute concerning the computerized data system that FirePond created and serviced for GM. Specifically, FirePond contends that because "the entire GM complaint was set in the context of FirePond's performance of 'electronic and information technology services' for GM, those services clearly had a causal connection to GM's lawsuit." (Pl.'s Mem. in Resp. to Defs.' Mot. for Summ. J. at 2.)[9]

---

[9] The parties both presented choice-of-law arguments in their briefs. However, the parties do not dispute that the "arising out of" language is interpreted similarly under Minnesota and Massachusetts law. *See Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 7 (1st Cir. 2000) (stating that under Massachusetts law, "['arising out of'] is generally understood to mean 'originating from,' 'growing out of,' 'flowing from,' 'incident to,' or 'having connection with'"); *Rausch v. Beech Aircraft Corp.*, 277 N.W.2d 645, 647 (Minn. 1979) ("It has also been held that the policy term 'arising out of' means 'originating from,' or 'having its origin in,' 'growing out of,' or 'flowing from.'"). Because the outcome does not depend on which state's law applies, Minnesota and Massachusetts law do not conflict, and the Court need not engage in a choice-of-law analysis. *Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 29 (Minn. 1996); *see also Nodak Mut. Ins. Co. v. Am. Family Ins. Co.*, 604 N.W.2d 91, 93-94 (Minn. 2000) (noting that a conflict exists only if "the choice of one forum's law over the other will determine the outcome of the case").

The Court notes, however, that even if Massachusetts law applies as to the interpretation of "negligent act, error or omission," and is interpreted in such a way consistent with FirePond's assertions—whereby a policy that provides coverage for a "negligent act, error or omission" encompasses breach-of-contract claims based on
(Footnote Continued on Next Page)

The Court disagrees with FirePond's interpretation of the EIT Policy. First, the Court notes that technically, the terms "arising out of" modify the terms "wrongful act," not "the performance or failure to perform electronic and information technology services," as FirePond suggests. Moreover, even a broad interpretation of "the performance or failure to perform electronic and information technology services" would not invoke coverage in the present case. The Court cannot ignore the plain and unambiguous language of the policy. Regardless of whether the policy is characterized as a professional liability policy or not, the policy unambiguously limits any coverage to claims arising out of a wrongful act *in the performance or failure to perform electronic and information technology services*. The policy further specifically defines "electronic and information technology services" as computer related services. The Court cannot interpret the term-at-issue to be broader than the specifically provided limitation and definition in the policy. *See Cargill, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. A03-187, 2004 WL 51671, at *17 (Minn. Ct. App. Jan. 13, 2004) (unpublished opinion) (concluding that "the injury does not fall within the scope of the policy's definition of 'advertising injury' because it does not arise out of an offense specifically listed in the policy").

---

(Footnote Continued From Previous Page)
non-negligent errors or mistakes, the result would be the same. The "error" still had to be done in the context of performing or failing to perform electronic and information technology services. FirePond's alleged "error" in terminating the 1994 Agreement by failing to provide GM with adequate notice to cure was not done in this context.

Here, the claims asserted in the GM Lawsuit did not arise out of an act that was done in the performance or the failure to perform computer related services.  In fact, GM's complaint does not suggest that there was an issue with the electronic and information technology services that FirePond provided.  Instead, all of the claims asserted in the GM complaint are based on the alleged premature termination of the 1994 Agreement, which flowed from a breach in payment.  Thus, even though the 1994 Agreement was entered into for the purpose of having FirePond perform electronic and information technology services for GM, the asserted claims did not flow from the performance of those services.  Because the EIT Policy specifically limited coverage to claims that flowed from the performance of computer related services, Chubb was correct in its determination that the GM Lawsuit was outside the scope of coverage afforded by the EIT Policy.  *See Nat'l Cas. Co. v. Bennett*, No. CIV. A. 97-5917, 1998 WL 559678, at *3 (Mass. Super. Aug. 25, 1998) (finding that where the policy stated that it insures for wrongful acts "arising out of the performance of law enforcement and/or other departmentally approved activities" "the term 'arising out of' in this context is interpreted as the furtherance of the employer's work" and finding that where the claim was in no way related to defendant's law enforcement duties, the company had no duty to defend or indemnify); *see also Tae v. Tae*, 783 N.E.2d 827, 830-31 (Mass. App. Ct. 2003) (stating that "[a]lthough the expression 'arising out of' indicates a wider range of causation than the concept of proximate causation in tort law . . . [i]n the last analysis, the court must make a judgment call," and deeming the plaintiffs' injuries "as insufficiently dependent on the defendant's use of the automobile to be covered by the automobile insurance

13

policy") (quotations omitted).  Because the GM Lawsuit was outside the scope of coverage afforded by the EIT Policy, Chubb did not have a duty to investigate or defend.

The Court finds that the GM Lawsuit is outside the scope of coverage afforded by the EIT Policy as a matter of law, based on the above clear and unambiguous policy limitation.  Therefore, the Court need not address the parties remaining arguments, including whether the EIT Policy limited coverage to negligence claims, whether the GM Lawsuit is outside the scope of coverage based on the policy exclusions, or whether Minnesota or Massachusetts law should be applied as it relates to those issues.

### III.  Duty to Indemnify

Because Chubb did not have a duty to defend, it did not have a duty to indemnify FirePond.  *See Metro. Prop. & Cas. Ins. Co. & Affiliates v. Miller*, 589 N.W.2d 297, 299 (Minn. 1999) ("The duty to defend is broader in scope than the duty to indemnify."); *Bagley v. Monticello Ins. Co.*, 720 N.E.2d 813, 817 (Mass. 1999) ("If an insurer has no duty to defend, based on the allegations in the plaintiff's complaint, it necessarily follows that the insurer does not have a duty to indemnify.").

### CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1.  Plaintiff FirePond's Motion for Summary Judgment (Doc. No. 16) is **DENIED.**

2.  Defendants Vigilant Insurance Company and Federal Insurance Company's Cross-Motion for Summary Judgment (Doc. No. 22) is **GRANTED**.

    3.    Plaintiff FirePond's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

    **LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  September 11, 2007        s/Donovan W. Frank
                                             DONOVAN W. FRANK
                                             Judge of United States District Court